IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 5, 2013

## ANTHONY DODSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-01015     J. Robert Carter, Jr., Judge**

_____

**No. W2012-00567-CCA-R3-PC  - Filed March 21, 2013**

_____

The Petitioner, Anthony Dodson, appeals the Shelby County Criminal Court's denial of post-conviction relief. On appeal, the Petitioner argues that (1) the post-conviction court abused its discretion in refusing to grant a continuance for the purpose of having a witness testify at the post-conviction hearing, and (2) trial counsel provided ineffective assistance of counsel by failing to call the aforementioned witness to testify at trial for the purpose of impeaching the victim's testimony. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Claiborne H. Ferguson and Bridgett L. Stigger, Memphis, Tennessee, for the Petitioner-Appellant, Anthony Dodson.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul F. Goodman, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

A Shelby County Grand Jury indicted the Petitioner for attempted first degree murder and theft of property valued at more than $1,000 but less than $10,000. State v. Anthony Dodson, No. W2009-02568-CCA-R3-CD, 2011 WL 2176581, at *3 (Tenn. Crim. App. June 2, 2011). At trial, the State dismissed the theft charge. Id. The Petitioner was subsequently convicted of attempted first degree murder, and the trial court sentenced him as a Range I, standard offender to twenty-five years in the Tennessee Department of Correction. Id. at *4. On appeal, this court upheld the Petitioner's conviction and sentence. Id. at *1. On

September 27, 2011, the Petitioner filed a pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended post-conviction petition. After an evidentiary hearing, the court denied post-conviction relief, and the Petitioner filed a timely notice of appeal.

**Facts.** On direct appeal, this court summarized the evidence presented at trial:

At trial, the victim and the defendant gave two vastly different accounts of the events that transpired during the early morning hours of December 28, 2007. According to the victim's testimony, she and the defendant had been boyfriend and girlfriend for approximately eight months and had been living together in her mother's home for some time. On the night in question, she left her job at Federal Express at around three a.m. Thereafter, she attempted to reach the defendant on his cell phone numerous times. The defendant would either hang up on her or not answer the phone. When the victim arrived at her home, the defendant's car was not there. The victim then became angry at the defendant's suspicious behavior and made the decision to throw him out of her house.

After a period of time, the victim finally reached the defendant by phone. He gave several different explanations for his whereabouts, but the victim drove around checking out each of these explanations and found none of them to be credible. She returned to her home, and the defendant eventually returned home as well, urging reconciliation and making various excuses for his behavior. The victim, however, refused to be appeased and responded with a tirade directed at the defendant that culminated with the victim ordering the defendant to leave her home. In response, the defendant cursed at her but stated that he was going to vacate the premises. However, while continuing to proclaim his intention to immediately leave, he, instead, reached under the bed they shared, grabbed a .38 caliber revolver handgun and a box of bullets belonging to the victim, and proceeded to load the weapon. After briefly grabbing at his arm, the victim turned and fled in a vain attempt to reach her panic button before the defendant shot her. The victim was knocked to the ground by what she presumed was a bullet, and she drifted in and out of consciousness. After some time, she attempted to get herself up, knocking over a silk tree in the process. The victim found herself unable to see but eventually kicked out the glass and screen of a window, causing a gash in her leg. Once the victim made it outdoors, she rested for a time on the ground in the pouring rain and screamed for help. She eventually heard a "Caucasian"-sounding man's voice ask her, "who did this to you?" The victim replied that

her boyfriend, the defendant, had shot her. After that, she lost consciousness and later awoke in a hospital.

The defendant testified to a very different version of events when he took the stand in his own defense. He started by explaining his criminal history, which included convictions for aggravated robbery and kidnaping, as well as a misdemeanor handgun violation. After explaining these offenses, the defendant related that he became involved with the victim after meeting her through a chat line during April of 2006, despite his being married at the time. Although the victim initially told him that she had never been married, he later found out that she had been and was still married to someone else. Nonetheless, things progressed in their relationship to the point that the defendant decided to move in with her in November of 2006. At some point, the defendant discovered that the victim was "bisexual" and was "very promiscuous with women," which apparently caused him some concern. His suspicions only grew sometime later when he discovered the victim engaging in chat line activities on her computer, even though he had apparently believed that she had ceased all such activities.

Later, on an unspecified night, the victim's cell phone issued an audible buzzing, and the defendant was able to reach the phone before the victim. He discovered an incriminating text message on the phone, which appeared to confirm that the victim was engaging in an affair with a female coworker. This fact, combined with some other suspicious behavior on the part of the victim involving an unusual amount of time she was taking off from work, led the defendant to check up on the victim on the night of December 27, 2007. On that particular evening, while coming home from his work, he visually determined that the victim's car was not located where he thought it ought to be parked. The defendant went to her house and later left, driving aimlessly around. At approximately three a.m., the victim called the defendant and insisted that she was at work, but when the defendant tried to call her back, neither she nor any other Federal Express employee would answer the phone. The victim called the defendant again and insisted that the defendant was "not calling." The defendant responded by accusing her of cheating, stating his intention to leave, and threatening to inform the victim's mother that she was a lesbian.

When the defendant returned to the victim's house to collect his personal possessions, the two got into an argument concerning the defendant's alleged jealousy and whether or not the defendant was going to tell the

-3-

victim's mother about her sexual activities. The defendant testified that he went to the closet to get his clothes. When he came back, the victim had dumped out her handbag, and the defendant noticed that she now held a gun in her hand. The defendant inquired of the victim why she was "playing with that gun" and unleashed a torrent of aspersions toward her, deriding her for her alleged promiscuity and sexual orientation. The victim then fired a single bullet at him, which missed and passed through the window behind him. According to the defendant, he then lunged at the victim and grabbed her hand. The two commenced wrestling, and, during the struggle, the gun went off twice. The victim collapsed. The defendant explained that he panicked after the gun went off and that all his thoughts turned to fleeing the scene. Unable to locate his own keys, he grabbed those belonging to the victim and drove from the house in the victim's vehicle. Before he left, however, he was able to determine that the victim was still alive because she was "snoring."

The defendant then called his own wife, from whom he had been previously separated, and related what had transpired. Although his wife advised him to turn himself over to the proper authorities, the defendant told his wife that the victim had merely suffered a grazing bullet wound and would be all right. Instead, the defendant decided to move to Louisiana and start working at a new job. He told his wife that after he saved up enough money for a lawyer, he would return back to Tennessee to face the consequences. The defendant testified that he worked in Louisiana for five months before he was arrested and brought back to Shelby County.

In addition to the testimony of the victim, the State presented the testimony of Lieutenant James Grigsby of the Memphis Police Department, who responded to the call to the victim's residence on the night of the crime. Officer Grigsby testified that when he arrived, he heard a woman yelling for help from her backyard. He further testified that when he found the woman she was conscious, soaking wet, and visibly injured. The woman claimed that she was unable to see. A window leading to the victim's residence was open nearby, and a window screen was lying outside it on the ground as though someone had recently gone through it. Officer Grigsby directed other responding officers to enter the victim's house through that open window because all the doors to the house were found to be locked. After determining that the house was empty, he and the other officers moved the victim back into the house to get her out of the inclement weather. Once inside the house, Officer Grigsby observed that the victim's bedroom was in disarray and that there was blood on the carpet and in the bathroom. He further testified that

-4-

there was a gun case and a box of bullets lying on the bed. He also observed a bullet hole through one of the bedroom windows.

Officer Grigsby called for an ambulance and asked the injured woman what had transpired. The woman informed him that she and her live-in boyfriend had argued after he had been out all night, and she had started throwing all of his clothes by the front door in the course of ending the relationship. She further stated that the argument had turned physical and that, ultimately, he had shot her in the head.

Thereafter, the State presented the testimony of Officer Lavern Jones, a crime scene investigator with the Memphis Police Department. Officer Jones processed the crime scene on the night in question and authenticated several photographs she had taken of the location. From the photographs, she identified a box of live rounds and loose bullets that were discovered on the bed. She also testified that despite searching, she failed to recover any spent bullets or shell casings from the crime scene. Before concluding, Officer Jones identified a bullet hole in the victim's master bedroom window, various bloodstains, and an overturned plant from her crime scene photographs.

Finally, the State presented the testimony of Dr. Thomas Oliver, a doctor of neurosurgery, who was the victim's treating physician at the Regional Medical Center at Memphis (MED) on the night in question. He testified that he performed emergency procedures on the victim and dictated an operative report concerning her injury. Dr. Oliver testified that he performed a CAT scan on the victim and explained the results of that CAT scan to the jury. From his visual examination of the victim and the results of the CAT scan, Dr. Oliver determined that the victim had an entry wound to the back of her head and a portion of a bullet (as well as accompanying metal fragments) lodged in her brain. He testified that he operated on the victim to repair the entry hole, wash out the victim's brain, and remove numerous bits of metal fragment. He testified, however, that he had to leave the largest portion of the bullet in place in the victim's brain because any attempt to remove it could have caused additional brain damage. He testified that the victim would likely experience permanent impairment to her vision owing to the damage caused to her optic nerves by the injury.

Dr. Oliver further testified that the victim appeared to have a second, "grazing" wound to the other side of her head, which he closed with staples. He explained that he recovered no bullets from this area because whatever had

caused the injury had not fully entered the body. Dr. Oliver testified that in order to inflict these injuries, a shooter would have had to have been located behind the victim's head. Dr. Oliver further testified that he saw no powder burns or anything of that nature on the victim's hair before he shaved it off in order to perform the operation. After presenting this testimony, the State rested.

The defendant took the stand in his own defense and testified as described above. The defense presented no other evidence. On May 21, 2009, the defendant was found guilty of attempted first degree murder. On September 29, 2009, the defendant was sentenced to twenty-five years as a Range I, standard offender.

Id. at *1-4.

**February 2, 2012 Hearing.** The day prior to the post-conviction hearing, Petitioner's counsel requested a continuance because the Petitioner had recently informed her that information helpful to his post-conviction case was in the discovery packet. Counsel said that although she was unable to find the aforementioned information in the discovery packet, she believed that this information might have been included in an amendment to the discovery and wanted to call Lois Oyster, who had investigated the Petitioner's case, to testify about this information. Counsel added that Oyster was no longer employed with the public defender's office and had moved to Nashville. The following exchange occurred between the court and post-conviction counsel:

| The Court: | Well, I am, I guess–I don't know that I am going to preclude your, per se, calling a witness, but I am going to have to have more than you'd just like to have this witness. |
| --- | --- |
| | What is the substance of [this information] and how is it relevant to what we are doing and is there some other way that we can get to the bottom of this? |
| | And, if there is, you know, we will go around it. |
| | My inclination is this, though, I think that we are going to hold this case until tomorrow[,] and we're going to begin in that matter. If at the |

-6-

conclusion of whatever we have in terms of proof tomorrow, if we need this witness, then we may bifurcate it[,] and I'll set it off in time to get – if you can show me how I need that witness, we'll see what we can do about it.

But, at this point[,] I am not going to reset it, because you–

[Appellate Counsel]:      I understand.

The Court:      So, [Petitioner], I am finishing off a trial right now. So I am going to finish that, but I want to start on your hearing tomorrow. I want to hear [about this information]–and if your attorney can show me a reason that we need [Lois Oyster], then we will do what we can to get her here at another time; do you understand?

[The Petitioner]:      Yes, sir.

. . . .

The Court:      . . . And we will hear from you tomorrow, [Petitioner,] and I'll let your attorney talk[,] and it may be that we can get this information without having to bring somebody here from Nashville. I mean, maybe, I don't know what it is, but I am going to give [you] the chance to try to work that out.

[Appellate counsel]:      Thank you, Your Honor.

**February 3, 2012 Post-Conviction Hearing.** At the February 3, 2012 post-conviction hearing, several exhibits were admitted, including the transcript from the Petitioner's trial. The Petitioner called trial counsel to testify and testified in his own behalf.

Trial counsel testified that he had been employed with the Shelby County Public Defender's office since 1995 and was appointed to represent the Petitioner in 2008. He stated that he requested Lois Oyster, an investigator in the public defender's office, to

investigate the Petitioner's case. Trial counsel stated that the Petitioner had "indicated that the victim was going to say or might say that this was an accident or [that] he didn't intend to shoot her and so I had my investigator contact [the victim.]" He said that when Oyster contacted the victim, the victim told Oyster "that she didn't know if [the shooting] was on purpose or not."

Trial counsel stated that when he cross-examined the victim about her statement to Oyster, he remembered the victim responding that "either she didn't make that statement" or that the shooting was intentional because the Petitioner shot her "in the back of the head twice." He said he did not call Oyster to testify because he "didn't think it was relevant[,]" given that the victim's testimony at trial was consistent with the victim's initial statement to police. Trial counsel acknowledged that his defense theory at trial was that the Petitioner and the victim were fighting over the gun and the gun accidentally fired, hitting the victim in the back of the head two times.

After trial counsel's testimony, the post-conviction court revisited the issue regarding the need for Lois Oyster's testimony:

| The Court: | Okay. Did we resolve–I mean did we resolve the issue of the Lois Oyster matter to everyone's satisfaction or do we still feel that we need her at some point or what? Where are we on that? |
| --- | --- |
| [The State]: | I don't see why she's needed because I don't know how [trial counsel] could have used her during the trial but I just– |
| The Court: | Okay. I've got–I'm good on your position. What do you say, [post-conviction counsel]? |
| [Post-Conviction Counsel]: | From [trial counsel's] testimony he–he never spoke with [Oyster]–he cannot say what Ms. Oyster would have testified to. He cannot say this is the phone conversation– |
| The Court: | Right. |

| | |
|---|---|
| [Post-Conviction Counsel]: | –Ms. Oyster had with the victim. |
| The Court: | And if I hear you correctly, we've alluded to some written statement that supposedly the victim made but none of us can find that. Is that where we are? |
| [Post-Conviction Counsel]: | That's correct. And all that we have are the notes that Ms. Oyster took from the phone conversation with the victim. |

The post-conviction court asked trial counsel to return to the stand so that it could ask some additional questions regarding this issue. When the court asked trial counsel if Oyster had taken a written statement from the victim, trial counsel replied that Oyster's notes were just a summary of what the victim told her during their interview. Trial counsel then confirmed that Oyster never took a formal statement signed by the victim because that was not the policy of the investigators in the public defender's office. The trial court then had the following conversation with post-conviction counsel:

| | |
|---|---|
| The Court: | Now, did you have anything further, [post-conviction counsel], on that matter that I've opened up here? |
| [Post-Conviction Counsel]: | No, Your Honor. That was not my issue though. |
| The Court: | Right. It's mine though and that's why–but I'm giving you an opportunity since I've now examined [trial counsel]. I wanted to know if you wanted to ask him anything more. |
| [Post-Conviction Counsel]: | No, Your Honor. |

The Petitioner was called to the stand and testified that he was currently incarcerated for his conviction for attempted first degree murder, for which he was serving a sentence of twenty-five years. He acknowledged that if the court granted post-conviction relief, he would be given a new trial, and the State would likely file an enhancement, which meant that he would be facing a much harsher sentence on re-trial than the twenty-five years he had

received in his first trial. The Petitioner stated that he still wanted to proceed with his post-conviction case.

The Petitioner claimed that trial counsel was ineffective in failing to impeach the victim with Oyster's report from their interview. He acknowledged that trial counsel asked the victim at trial whether she said the shooting was accidental or intentional and that the victim testified that she told Oyster that the shooting was intentional. The Petitioner said that trial counsel, at that point, should have called Oyster to the stand to impeach the victim's testimony on this issue. The Petitioner stated that although he asked trial counsel to impeach the victim by admitting the investigator's report into evidence, trial counsel failed to take this action.

At the conclusion of the post-conviction hearing, the court took the matter under advisement. On March 9, 2012, the court filed its order denying post-conviction relief. In it, the court made the following findings of fact:

> Petitioner . . . argues that his attorney should have called an investigator for the Public Defender's Office as a witness in the trial. Petitioner apparently believed that [t]he victim would testify that the shooting was an accident. She did not.
>
> He also believes that the victim had given a statement to the investigator confirming this. The trial attorney did not agree with this, remembering that the victim at one time may have said she didn't know what the Petitioner was thinking.
>
> No proof was produced at the hearing concerning any statement of the victim, nor was the investigator called as a witness.

The court also stated the following conclusions of law in its order denying post-conviction relief:

> This is a matter where Petitioner was unhappy with the verdict of the jury. The burden of proof is on Petitioner to demonstrate that (1) his counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984).
>
> In this case, the Petitioner has failed to show that his attorney's performance was, in any[]way, deficient.

-10-

Following entry of this order, the Petitioner filed a timely notice of appeal.

**ANALYSIS**

**I. Continuance.** The Petitioner argues that the post-conviction court erred in not granting a continuance for the purpose of having Lois Oyster testify at the post-conviction hearing. He asserts that the court should have granted his request for a continuance because his hearing "had been pending for less than five months" and that "counsel had been appointed for only four months before the hearing date." He also argues that if the post-conviction court had granted the continuance, "Ms. Oyster very likely would have been able to testify about the interview she conducted with the victim, and the statements [the victim] made regarding whether the shooting was accidental or intentional." The State responds that the Petitioner has waived this issue by failing to pursue the issue of bifurcating the hearing in order to have Oyster testify when the court gave the Petitioner the opportunity. See Tenn. R. App. P. 36(a). We agree with the State and conclude that the trial court did not abuse its discretion in denying the request for a continuance.

The granting of a continuance lies within the sound discretion of the trial court, and this court will not reverse a decision regarding a continuance unless the trial court abused its discretion. State v. Schmeiderer, 319 S.W.3d 607, 617 (Tenn. 2010) (citing State v. Odom, 137 S.W.3d 572, 589 (Tenn. 2004)). "'An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.'" Id. (quoting State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995)). The party requesting the continuance has the burden of showing that the court's action was prejudicial. State v. Goodman, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982). "The only test is whether the defendant has been deprived of his rights and an injustice done." Id. Tennessee Supreme Court Rule 28, section 8(B) states that the evidentiary hearing on a petition for post-conviction relief "shall not be continued except by order of the court finding that unforeseeable circumstances render a continuance a manifest necessity. No continuance shall extend the hearing more than sixty (60) days beyond the original hearing date."

Here, Petitioner's counsel did not request a continuance of the post-conviction hearing until the scheduled hearing date. When she requested the continuance, she stated only that the Petitioner had notified her of some information he claimed was helpful to his case and that she believed the only source of this information was Lois Oyster, a former investigator for the public defender's office, who currently resided in Nashville. Based on this limited information, the court stated that it wanted to see how the proof developed the following day and that it would consider the possibility of bifurcating the hearing if it felt it were necessary to have Oyster testify.

-11-

The court, the next day at the post-conviction hearing, gave the Petitioner every opportunity to show why Oyster's testimony was needed in his post-conviction case. During the hearing, trial counsel testified that he asked Oyster to talk to the victim because the Petitioner had told him that the victim might say the incident was an accident. Trial counsel then said that when Oyster talked to the victim, the victim told her that she did not know whether the shooting was intentional or not. Finally, trial counsel stated that when he cross-examined the victim at trial regarding the statement she made to Oyster, the victim denied making the statement about her being unsure if the shooting was intentional and asserted that the shooting was intentional because the Petitioner shot her twice in the back of the head. Trial counsel further testified that the victim's testimony at trial was consistent with her statement to the police. At that point, the post-conviction court revisited the issue of Oyster's testimony and asked the parties if this issue had been resolved. The court then asked trial counsel to return to the stand to answer a few additional questions. In response to the court's questioning, trial counsel stated that Oyster wrote only a summary of her interview with the victim and never obtained a formal, signed statement from the victim. At the end of this questioning, the court asked post-conviction counsel if there was any other evidence she wanted to offer, and she replied that there was not.

During the rest of the post-conviction hearing, the Petitioner never objected about the absence of Oyster's testimony and never requested that the trial court bifurcate the hearing for the purpose of obtaining Oyster's testimony. In addition, the Petitioner never entered Oyster's summary of her interview with the victim into evidence. The record shows that the Petitioner failed to pursue the matter, failed to request a bifurcation of the hearing, and failed to make additional objections regarding the need for Oyster's testimony. Accordingly, we conclude that this matter is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We further conclude that the trial court did not abuse its discretion in initially denying the request for a continuance.

**II. Ineffective Assistance of Counsel.** The Petitioner also contends that trial counsel provided ineffective assistance of counsel by failing to call Oyster to impeach the victim's testimony at trial that the shooting was intentional. He claims that Oyster's testimony would have impeached the victim's testimony because Oyster's notes stated that the victim was unable to say whether the shooting was accidental or intentional, which supported the defense's theory that the Petitioner and the victim struggled over the gun, causing it to accidentally fire. The State responds that the record supports the trial court's denial of post-conviction relief. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2012). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn also repeated well-settled principles applicable to claims of ineffective assistance of counsel:

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938

S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

Here, the Petitioner contends that trial counsel provided ineffective assistance in failing to have Lois Oyster testify at trial. In his brief, the Petitioner refers to Exhibit A, Oyster's summary of her interview with the victim, which he attached to his appellate brief. The State asserts that because Exhibit A was not introduced as an exhibit at the post-conviction hearing and was merely attached to the Petitioner's brief, it is not a part of the record and cannot be considered by this court. We agree.

This court has repeatedly held that it may not consider documents attached to appellate briefs which have not been presented to the trial court. See Tenn. R. App. P. 24(g); State v. Matthews, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990) (holding that this court could not consider a transcript attached to the appellant's brief because it was not made a part of the record); Grover L. Dunigan v. State, No. E2005-01574-CCA-R3-PC, 2006 WL 433699, at *3 (Tenn. Crim. App., at Nashville, at Knoxville, Feb. 23, 2006) (stating that "documents attached to an appellate brief but not included in the record on appeal cannot be considered by this court as part of the record on appeal"); Billy Noble Forrest v. John Rees, Warden, No. 01C01-9411-CC-00387, 1996 WL 571765, at *3 (Tenn. Crim. App., at Nashville, Oct. 8, 1996) (stating that "attachments to briefs are not evidence and will not be considered by the appellate courts"). Although the Petitioner attempted to make Oyster's summary a part of

the record by attaching it as an exhibit to his appellate brief, we cannot consider this document because it is not a part of the appellate record. Accordingly, we will not consider this document in determining whether trial counsel provided ineffective assistance of counsel.

In the previous section, we held that the post-conviction court did not abuse its discretion in refusing to grant the Petitioner's request for a continuance for the purpose of having Oyster testify at the post-conviction hearing. Because the court denied the continuance, the Petitioner did not present testimony from Oyster at the post-conviction hearing. This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id.

We are unable to determine what Oyster's testimony might have been regarding the victim's statements to her about the shooting. Consequently, we are unable to evaluate whether the trial counsel's failure to call Oyster to testify at trial prejudiced the Petitioner. We note that not only did the Petitioner fail to present Oyster at the evidentiary hearing but he also failed to enter Oyster's summary of her interview with the victim into evidence at the post-conviction hearing. A review of the transcript from the Petitioner's trial shows that trial counsel cross-examined the victim regarding the statement she made to Oyster. When trial counsel asked the victim if she recalled telling Oyster that she did not know if this was an accidental or intentional shooting, the victim replied, "No, [Oyster] asked me was it accidental. I said, no, because he had loaded the weapon." Later in the cross-examination the victim stated, "No, I didn't tell [Oyster] it was an accidental shooting at all." We note that the victim's testimony at trial that the shooting was intentional was consistent with her statement to police regarding the incident. Even if Oyster testified that the victim told her she was not sure whether the shooting was intentional or accidental, the jury could have inferred that the shooting was intentional based on the victim's testimony, the proof that the

-15-

Petitioner shot the victim twice in the back of the head, and the evidence that the Petitioner never called anyone to help the victim before fleeing the state. The record supports the post-conviction court's determination that trial counsel did not provide ineffective assistance by failing to call Oyster at trial. The Petitioner has failed to establish his claim of ineffective assistance of counsel by clear and convincing evidence and, therefore, is not entitled to relief.

## CONCLUSION

We conclude that the post-conviction court did not abuse its discretion in denying the Petitioner's request for a continuance and that the Petitioner failed to meet his burden of showing that he was denied effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE